## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| WILLIAM BROWNING, derivatively on behalf of ENVIVA INC. | Case No: |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| RALPH ALEXANDER, JOHN C. BUMGARNER, JR., JANET S. WONG, EVA T. ZLOTNICKA, MARTIN N. DAVIDSON, JIM H. DERRYBERRY, JOHN KEPPLER, GERRITY LANSING, PIERRE F. LAPEYRE, JR., DAIVD M. LEUSCHEN, THOMAS METH, JEFFREY W. UBBEN, GARY L. WHITLOCK, SHAI S. EVEN, AND MICHAEL A. JOHNSON, | JURY TRIAL DEMANDED |
| Defendants, | |
| and, | |
| ENVIVA INC. | |
| Nominal Defendant. | |

Plaintiff William Browning ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Enviva Inc. ("Enviva" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have occurred from February 21, 2019 through the present (the "Relevant Period") and have caused substantial harm to the Company.

2.      Enviva, formerly known as Enviva Partners, LP, develops, constructs, acquires, and owns and operates, fully contracted wood pellet production plants.  The Company's products are used as a substitute for coal in power generation, and combined heat and power plants.  Significantly, Enviva touts itself as a "growth-oriented" environmental, social, and governance ("ESG") company with a "platform to generate stable and growing cash flows."

3.      Throughout the Relevant Period, Individual Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.

4.      As a result of the Individual Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has suffered significant losses and damages.

## JURISDICTION AND VENUE

5.      The claims asserted herein arise under §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), and SEC Rule 10b-5, 17 C.F.R. §§ 240.10b-5, promulgated thereunder.  This Court has jurisdiction over the subject matter of this action under § 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331 because this is a civil action arising under the laws of the United States of America.

6.      This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

4858-9120-2452, v. 6

7.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

8.    In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Individual Defendants (defined below) have conducted business in this District, and the Individual Defendants' actions have had an effect in this District.

## THE PARTIES

**Plaintiff**

10.    *Plaintiff William Browning* ("Plaintiff") is, and was at all relevant times, a shareholder of the Company.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

11.    *Nominal Defendant Enviva* is a Delaware corporation with principal executive offices located at 7272 Wisconsin Avenue, Suite 1800, Bethesda, Maryland 20814.  Enviva's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the trading symbol "EVA."

12.    *Defendant Ralph Alexander* ("Alexander") has served as a Company director since November 2013 and is the acting Chairman of the Board of Directors (the "Board").

13.    *Defendant John C. Bumgarner, Jr.* ("Bumgarner") has served as a Company director since April 2015. Defendant Bumgarner is also the Chair of the Compensation Committee.

3

14. **Defendant Janet S. Wong** ("Wong") has served as a Company director since April 2015. Defendant Wong is also the Chair of the Audit Committee.

15. **Defendant Eva T. Zlotnicka** ("Zlotnicka") has served as a Company director since 2021. Defendant Zlotnicka is also the Chair of the Health, Safety, Sustainability, and Environmental Committee.

16. **Defendant Martin N. Davidson** ("Davidson") has served as a Company director since 2021.

17. **Defendant Jim H. Derryberry** ("Derryberry") has served as a Company director since 2018.

18. **Defendant John Keppler** ("Keppler") has served as a Company director since 2023, having previously served as the Company's Chief Executive Officer ("CEO") from 2004 through 2022.  Defendant Keppler is a named defendant in the Fagen Action and Dhatt Action (defined below).

19. **Defendant Gerrity Lansing** ("Lansing") has served as a Company director since 2020.

20. **Defendant Pierre F. Lapeyre, Jr.** ("Lapeyre") has served as a Company director since 2021.

21. **Defendant David M. Leuschen** ("Leuschen") has served as a Company director since 2021.

22. **Defendant Thomas Meth** ("Meth") is a Co-Founder, President, CEO, and director of the Company. Prior to his appointment as CEO, and while President of the Company, Defendant Meth was the Company's Chief Commercial Officer.  Defendant Meth is a named defendant in the Dhatt Action (defined below).

23. **Defendant Jeffrey W. Ubben** ("Ubben") has served as a Company director since 2020.

4

24.    **Defendant Gary L. Whitlock** ("Whitlock") has served as a Company director since 2016. Defendant Whitlock is also the Chair of the Finance Committee.

25.    **Defendant Shai S. Even** ("Even") was the Company's Chief Financial Officer ("CFO") and Executive Vice President from June 2018 through August 2023.  Defendant Even is a named defendant in the Fagen Action and the Dhatt Action (defined below).

26.    **Defendant Michael A. Johnson** ("Johnson") was the Company's Chief Accounting Officer ("CAO") from June 2021 through May 2023. Defendant Johnson is a named defendant in the Dhatt Action (defined below).

27.    The above-named defendants at ¶¶ 12–26 are referred to herein as the "Individual Defendants."

28.    The above-named defendants at ¶¶ 12–24 are referred to herein as the "Director Defendants."

29.    The Individual Defendants along with the Company are referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

30.    Enviva, formerly known as Enviva Partners, LP, develops, constructs, acquires, and owns and operates, fully contracted wood pellet production plants.  The Company's products are used as a substitute for coal in power generation, and combined heat and power plants.  Significantly, Enviva touts itself as a "growth-oriented" ESG company with a "platform to generate stable and growing cash flows."

**False and Misleading Statements**

*2019–2021 False and Misleading Statements*

5

31.    The Relevant Period begins on February 21, 2019, the day after the Company

issued a press release during after-market hours announcing the Company's Q4 and full year

2018 financial results.  The press release stated:

> "Despite the challenges in 2018 from the Chesapeake Incident and Hurricanes Florence and Michael, we closed the year strong, generating almost $34 million in adjusted EBITDA for the fourth quarter," said John Keppler, Chairman and Chief Executive Officer of Enviva. "With expansions underway inside the Partnership and tremendous development activities at the sponsor, our anticipated growth in 2019 will help us make material progress towards our goal of more than doubling the adjusted EBITDA of the Partnership over the next few years."

***

> **Sustainability**
>
> Since the Enviva Forest Conservation Fund was launched in 2015, our sponsor has contributed to the conservation of more than 17,000 acres of sensitive forests, which is nearly half of the initial 10-year target of 35,000 acres. Programs like the Enviva Forest Conservation Fund and our sponsor's industry leading Track & Trace® system demonstrate our commitment to sustainability in ways that extend far beyond third-party audits, compliance, and certification. During 2018, our sponsor nearly doubled the total acres enrolled in the Independently Managed Group ("IMG") it operates under the American Tree Farm System ("ATFS"). The IMG is one of the innovative ways our sponsor increases sustainably certified forestlands across the Southeastern United States. Through the IMG and other efforts with state tree farm systems, our sponsor has added more than 66,000 certified acres to our supply base areas to date. In 2018, 45.2 percent of certified wood delivered to our four production plants in North Carolina and Virginia came from the IMG operated by our sponsor. Currently, one out of every ten acres of ATFS-certified forest land in North Carolina is enrolled in our sponsor's IMG. This significant increase in certified land demonstrates our and our sponsor's commitment to sustainable forestry practices and our customers' demand for responsibly sourced wood fiber.

32.    That same day, the Company hosted an earnings call with investors and analysts

to discuss the Company's Q4 2018 results (the "Q4 2018 Earnings Call").  During the Q4 2018

Earnings Call, Defendant Keppler stated:

> Sustainability is the foundation of our business and is increasingly an area of focus for our investors, who place a great deal of value on having Enviva as in ESG investment in their portfolio. With the wood pellets we have committed to deliver under our contracted backlog, we will displace more than 64 million

6

tons of coal. That's an amazing statement about sustainability, but exactly how we're doing that showcases some of our innovation and leadership on the topic.

\*\*\*

Programs like the IMG, the Enviva Forest Conservation Fund and our industry leading track and trace system, tangibly and transparently illustrate our innovation on and commitment to sustainability in ways that extends far beyond third-party audits, and legal and regulatory compliance. So in sum, we've come through the challenges of 2018, building a solid platform to capitalize on the significant visible growth opportunities ahead. We are focused on sustainable, durable cash flow generation through reliable operating performance and a production capacity that is fully contracted with a global set of credit-worthy, diversified long-term offtake agreements.

33.    On March 4, 2019, the Company filed an Annual Report on Form 10-K with the

SEC, reporting the Company's financial and operating results for the year ended December 31,

2018 (the "2018 10-K").  In providing an overview of the Company, the 2018 10-K stated:

We are the world's largest supplier by production capacity of utility-grade wood pellets to major power generators. Since our entry into this business in 2010, we have executed multiple long-term, take-or-pay off-take contracts with utilities and large-scale power generators and have built and acquired the production and terminaling capacity necessary to serve them. Our existing production constitutes approximately 13% of current global utility-grade wood pellet production capacity and the product we deliver to our customers typically comprises a material portion of their fuel supply. We own and operate six industrial-scale production plants in the Southeastern United States that have a combined wood pellet production capacity of 2.9 million metric tons per year ("MTPY"). In addition to the volumes from our plants, we also procure approximately 0.5 million MPTY from the Second Hancock JV's Greenwood plant. We export wood pellets from our wholly owned dry-bulk, deep-water marine terminal in Chesapeake, Virginia (the "Chesapeake terminal") and terminal assets in Wilmington, North Carolina (the "Wilmington terminal"), and from third-party deep-water marine terminals in Mobile, Alabama (the "Mobile terminal") and Panama City, Florida (the "Panama City terminal"), under a short-term and a long-term contract, respectively. All of our facilities are located in geographic regions with low input costs and favorable transportation logistics. Owning these cost-advantaged assets, the output from which is fully contracted, in a rapidly expanding industry provides us with a platform to generate stable and growing cash flows that we anticipate will enable us to increase our per-unit cash distributions over time, which is our primary business objective.

34.    In addition, with respect to the Company's wood fiber procurement, the 2018

10K stated:

Our customers are subject to stringent requirements regarding the sustainability of the fuels they procure. In addition to our internal sustainability policies and initiatives, our wood fiber procurement is conducted in accordance with leading forest certification standards. Our fiber supply chains are routinely audited by independent third parties. We maintain multiple forest certifications including: Forest Stewardship Council (FSC®) Chain of Custody, FSC® Controlled Wood, Programme for the Endorsement of Forest Certification (PEFC™) Chain of Custody, Sustainable Forestry Initiative (SFI®) Fiber Sourcing and SFI® Chain of Custody. We have obtained independent third-party certification for all of our plants to the applicable Sustainable Biomass Program (SBP) Standards.

35.    Further, in discussing the Company's committees of the Board, the 2018 10-K stated:

### Health, Safety, Sustainability and Environmental Committee

The board of directors of our General Partner has established a Health, Safety, Sustainability and Environmental Committee (the "HSSE committee") consisting of Mr. Duggan and Mr. Reilly. The HSSE committee assists the board of directors of our General Partner in fulfilling its oversight responsibilities with respect to the board's and our continuing commitment to (1) ensuring the safety of our employees and the public and assuring that our businesses and facilities are operated and maintained in a safe and environmentally sound manner, (2) sustainability, including sustainable forestry practices, (3) delivering environmental benefits to our customers, the forests from which we source our wood fiber and the communities in which we operate and (4) minimizing the impact of our operations on the environment. The HSSE committee reviews and oversees our health, safety, sustainability and environmental policies, programs, issues and initiatives, reviews associated risks that affect or could affect us, our employees and the public and ensures proper management of those risks and reports to the board on health, safety, sustainability and environmental matters affecting us, our employees and the public. The members of the HSSE committee are non-employee directors of our General Partner.

36.    Appended to the 2018 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Keppler and Even, attesting that "the information contained in the [2018] 10-K fairly presents, in all material respects, the financial condition and results of operations of [Enviva]."

37.    On May 8, 2019, the Company issued a press release announcing the Company's Q1 2019 financial results.  In addition to touting the Company's purported commitment to sustainability, the press release stated:

"Our plant and port facilities delivered operating and financial results consistent with our expectations for what is historically our most seasonally challenging quarter," said John Keppler, Chairman and Chief Executive Officer of Enviva. "As we progress through the second quarter and into the back half of the year, we are excited about the opportunity to bring our new Hamlet plant online and for our sponsor to begin construction on the next set of fully contracted assets in our Port of Pascagoula cluster. With its confidence in the underlying business and the Partnership's growth trajectory, the Board declared a distribution of $0.645 per unit, our 15th consecutive quarterly increase since our IPO."

38.     On May 9, 2019, the Company hosted an earnings call with investors and analysts to discuss the Company's Q1 2019 results (the "Q1 2019 Earnings Call").  During the Q1 2019 Earnings Call, Defendant Keppler stated:

Before we open up for questions, I would like to take a minute to highlight our efforts around sustainability.  As the foundation of our business and an area of increasing focus for our investors who plays a great deal of value on having Enviva as an ESG investment in their portfolios.  As a company, our purpose is simple to improve the environment by displacing coal and growing more trees. Enviva's wood pellets directly displace coal in power generation and heating applications and lower the lifecycle greenhouse gas emissions profile of utilities.

***

To reflecting on Q1, it was a busy quarter.  We took important steps towards our long-term growth plan with a dropdown transaction and associated financing. We are focused on sustainable durable cash flow generation, which when coupled with organic growth and the development activities highlighted on this call. We expect to double the adjusted EBITDA of the partnership in a few years as we discussed last quarter and continue to build on our track record of 15 quarters of distribution increases.

39.     On August 7, 2019, the Company issued a press release announcing the Company's Q2 2019 financial results.  In addition to touting the Company's purported commitment to sustainability, the press release stated: "[c]onsistent with our operating profile in prior years, we expect much stronger adjusted EBITDA and distributable cash flow for the back half of the year to achieve our 2019 guidance, and we continue to target a distribution coverage ratio of 1.20 times on a forward-looking, annual basis."

40.     On August 8, 2019, the Company hosted an earnings call with investors and

analysts to discuss the Company's Q2 2019 results (the "Q2 2019 Earnings Call").  During the

Q2 2019 Earnings Call, Defendant Keppler stated:

> By design, the expectation is that all of the assets developed by the sponsor and
> its joint venture as well as the relating contract backlog, will be made available
> to the partnership for drop-down acquisitions. As we continue to grow,
> sustainability remains the foundation of our business and the core of our value
> proposition. Our industry leadership is not defined solely by the size and scale
> of our global operations, but also by our unparalleled sustainability practices.
>
> ***
>
> In sum, the second quarter is now on the books with results largely as expected.
> We believe we will end the year with strong operational and financial
> performance and continue our track record of increased distributions. Longer
> term, with the new contracts announced by our sponsor, we are aligned on
> growing and extending the runway for sustainable, durable cash flow
> generation. The level of growth and stability that we were able to achieve as an
> enterprise is made possible by the dedication and hard work of the great people
> at Enviva through achieving our plans, goals and, most importantly, each other
> 24 hours a day, 365 days a year.

41.     On October 30, 2019, the Company issued a press release announcing the

Company's Q3 2019 financial results.  In addition to promoting the Company's purported

commitment to sustainability, the press release stated:

> "With our increased visibility into the year-end shipping schedule, we continue
> to expect to finish the year with further strong, quarter-over-quarter
> improvements in adjusted EBITDA and distributable cash flow.  As such, we
> narrowed the ranges of our previously provided adjusted EBITDA and
> distributable cash flow guidance and reaffirm our distribution guidance for 2019
> and 2020," said Shai Even, Chief Financial Officer of Enviva.  "It was also nice
> to see our track record and continued growth in scale and diversification result
> in the recent credit rating upgrade, which brings our corporate rating to BB- /
> Ba3 from all three credit rating agencies."

42.     On October 31, 2019, the Company hosted an earnings call with investors and

analysts to discuss the Company's Q3 2019 results (the "Q3 2019 Earnings Call").  During the

scripted portion of the Q3 2019 Earnings Call, Defendant Keppler stated:

> In sum, we delivered our strongest quarter yet, with more than $39 million in
> adjusted EBITDA.  We expect the fourth quarter to be even better. We expect
> to distribute at least $2.65 per unit for 2019 and to grow that to between $2.87

and $2.97 in 2020. Longer term, we expect our executed contract backlog, robust contract pipeline, strong balance sheet capacity and support of sponsor to enable us to double 2019 adjusted EBITDA and continue to drive durable and sustainable increases in distributable cash flow per unit over time.

43.    On February 26, 2020, the Company issued a press release announcing the Company's Q4 and full year 2019 financial results.  In addition to touting the Company's purported commitment to sustainability, the press release stated:

> "As expected, we closed 2019 strong, achieving our highest-ever quarterly adjusted EBITDA on more than one million metric tons of wood pellets sold, and delivered full-year distributable cash flow at the high end of our guidance range," said John Keppler, Chairman and Chief Executive Officer of Enviva. "With the robust pipeline of production plants and terminals and related off-take contracts held by our sponsor and its joint venture, which we expect to be made available to the Partnership for acquisition, we are well-positioned to double our 2019 adjusted EBITDA in the next few years."

44.    On February 27, 2020, the Company filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2019 (the "2019 10-K").   The 2019 10-K contained substantively similar discussions of the Company's business, wood fiber procurement, sustainability, and Health, Safety, Sustainability and Environmental Committee as discussed above and appended as exhibits to the 2019 10-K were substantively similar SOX certifications signed by the Individual Defendants as referenced above.

45.    That same day, the Company hosted an earnings call with investors and analysts to discuss the Company's Q4 2019 results (the "Q4 2019 Earnings Call").  During the Q4 2019 Earnings Call, Defendant Keppler stated: "[a]s we continue to grow, we remain focused on driving our sustainability efforts, not only to provide for the transparency, but also to have a meaningful impact on conserving forests and growing more trees in the areas in which we operate."

11

46.     On April 29, 2020, the Company issued a press release announcing the Company's Q1 2020 financial results.  In addition to promoting the Company's purported commitment to sustainability, the press release stated:

> "Despite the COVID-19 pandemic and in what is typically our most seasonally challenging quarter, we reported strong first quarter 2020 results representing a significant improvement over the first quarter of 2019," said John Keppler, Chairman and Chief Executive Officer of Enviva. "Thanks to the hard work as well as good, safe decisions and work practices of our teams, our operations continue largely unaffected. While uncertainty remains in the COVID-19 environment, we believe we are well-positioned to continue to maintain stable, growing cash flows that enable us to increase distributions sustainably over time."

47.     On April 30, 2020, the Company hosted an earnings call with investors and analysts to discuss the Company's Q1 2020 results (the "Q1 2020 Earnings Call").  During the Q1 2020 Earnings Call, Defendant Keppler stated:

> Combined with our confidence and our ability to maintain stable and growing cash flows, our Board approved an increase in our distribution to $0.68 per unit, our 19th consecutive distribution increase, and reaffirmed our full-year adjusted EBITDA, distributable cash flow and per unit distribution guidance.
>
>                                         ***
>
> Through that growth, we and our sponsor remain focused on ensuring that our business activities support the best outcomes for people, forests, and the environment. Sustainability is core to our value proposition. And last week, we celebrated the 50th anniversary of Earth Day. This year [indiscernible] Earth Day was climate action, which for us is what we do every day by displacing coal, growing more trees and fighting climate change.

48.     On August 5, 2020, the Company issued a press release announcing the Company's Q2 2020 financial results.  In addition to promoting the Company's purported commitment to sustainability, the press release stated: "[s]imilar to previous years, the Partnership expects net income, adjusted EBITDA, and distributable cash flow for the second half of 2020 to be significantly higher than for the first half of the year."

49.    On August 6, 2020, the Company hosted an earnings call with investors and analysts to discuss the Company's Q2 2020 results (the "Q2 2020 Earnings Call").  During the Q2 2020 Earnings Call, Defendant Keppler stated:

> By Design, the partnership expects to have the opportunity to acquire these fully contracted assets and the associated long term offtake agreements in future drop in transactions. In visa, it's leading an industry that plays an increasingly critical role in the global fight against climate change. The climate benefits of sustainably produced wood pellets and the transparency of our sustainability and supply chain practices, really our ESG attributes are garnering international recognition by regulators, policymakers, academics, researchers and investors alike.

50.    On October 28, 2020, the Company issued a press release announcing the release of its first corporate sustainability report.  Among other things, that press release quoted Defendant Keppler:

> I am excited to share our first-ever Corporate Sustainability Report that not only reflects the journey that began when we founded Enviva more than 16 years ago but also looks ahead at the opportunities that exist for our company to continue to fuel positive change . . . .  This milestone document for Enviva focuses on the three core commitments that guide our work – people, forests, and climate change – and how they drive our approach to sustainability in all aspects of our business. The choices we make today will have lasting impacts for generations to come, and we are privileged to continue to have the input of so many valued stakeholders to inform our choices and help ensure that good biomass protects forests, empowers communities, and puts us on the path to net-zero emissions.

51.    On November 4, 2020, the Company issued a press release announcing its Q3 2020 financial results.  In addition to promoting the Company's purported commitment to sustainability, the press release stated: "[s]imilar to previous years, the Partnership expects net income, adjusted EBITDA, and distributable cash flow for the second half of 2020 to be significantly higher than for the first half of the year and for the fourth quarter to be a significant step up from the third quarter."

52.    On November 5, 2020, the Company hosted an earnings call with investors and analysts to discuss its Q3 2020 results (the "Q3 2020 Earnings Call").  During the Q3 2020 Earnings Call, Defendant Keppler stated:

Enviva is leading an industry that plays an increasingly critical role in the global fight against climate change. The climate benefits have sustainably produced wood pellets continue to garner international recognition and we are keenly focused on promoting forest growth and providing incremental transparency. On the subject of stewardship, we are excited adding Gerrity Lansing to our Board of Directors and benefiting from his deep experience and expertise in forest management and socially responsible investing as we continue to deepen our thought leadership and sustainability.

\*\*\*

As part of our commitment to provide incremental transparency into the sustainability of our business practices, the partnership and our sponsor recently published our first corporate sustainability report. This report provides a description of Enviva's 16-year sustainability journey from the partnership's humble beginnings as a start-up in 2004 to the publicly traded company with a global footprint that is Enviva today featuring a comprehensive review of our contribution to fighting climate change, our fiber procurement approach and forestland conservation efforts, our environmental, health, and safety processes, our human capital and diversity policies, and our corporate governance practices.

53.     On February 17, 2021, the Company issued a press release entitled *Enviva Targets NetZero Operations by 2030*. The press release stated:

Enviva's sustainably sourced wood is used to manufacture wood pellets, a renewable fuel source that provides global power and heat generators with a drop in alternative to fossil fuels. Enviva exports its sustainable wood pellets primarily to the U.K., Europe, the Caribbean and Japan, enabling its customers to reduce their carbon emissions by more than 85% on a lifecycle basis, helping them reach their greenhouse gas emissions reduction targets with renewable energy.

"At Enviva, fighting climate change is at the core of what we do," said John Keppler, Chairman and Chief Executive Officer of Enviva. "For more than a decade we have played a critical role in helping the world's energy producers substantially reduce their net carbon emissions by using sustainable bioenergy, enabling them to phase out coal, support increases in forest carbon stocks, and provide reliable, affordable energy to their communities.

54.     On February 24, 2021, the Company issued a press release announcing the Company's Q4 and full year 2020 financial results. In addition to promoting the Company's purported commitment to sustainability, the press release stated:

"We are very proud of our accomplishments in 2020. Despite the challenges presented by COVID-19, we operated our plant and terminal assets stably and reliably, we made uninterrupted deliveries to our customers, we completed two

transformative acquisitions, we met our increased guidance expectations for adjusted EBITDA, distributable cash flow, and full-year distributions, and we delivered a 30% total return to our unit holders, all while keeping our people safe and healthy," said John Keppler, Chairman and Chief Executive Officer of Enviva. "As we turn the page to 2021, our ability to generate stable cash flows that grow over time is poised to be more robust than ever, fueled both by organic growth as we look to replicate the highly accretive expansion projects in our existing portfolio and, against the backdrop of the forthcoming start-up of our sponsor's fully contracted Lucedale plant and Pascagoula terminal, coupled with existing and new long-term take-or-pay off-take energy supply contracts with large customers around the world, through additional drop-downs."

55.     On February 25, 2021, the Company filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2020 (the "2020 10-K").   The 2020 10-K contained substantively similar discussions of the Company's business, wood fiber procurement, sustainability, and Health, Safety, Sustainability and Environmental Committee as discussed above, and appended as exhibits to the 2020 10-K were substantively similar SOX certifications signed by the Individual Defendants as referenced above.

56.     That same day, the Company hosted an earnings call with investors and analysts to discuss its Q4 2020 results (the "Q4 2020 Earnings Call").   During the Q4 2020 Earnings Call, Defendant Keppler stated:

> Against a very challenging COVID-19 backdrop that continues to persist, we are very proud to report that we had our safest year ever. We did not miss a single customer delivery. We increased the fully contracted production capacity of the partnership by more than 30%. We increased our year-over-year adjusted EBITDA by more than 30% and we kept our promise to our unitholders, distributing $3 per unit for full year 2020, extending our track record of 22 consecutive quarterly distribution increases at a compound annual growth rate of 13% since our IPO and delivered a total unitholder return of 30% in 2020. We were able to achieve this in the face of broad economic and market volatility, in large part because the fully contracted nature of our business and its durable, sustainable operating profile that together generates stable, growing cash flows.
>
> ***
>
> [C]onsistent with the global communities' commitments and our own mission to displace coal and limit the impact of climate change, we and our sponsor have committed ourselves to become carbon neutral or net zero in our operations by

15

2030. This is an ambitious but attainable goal backed by detailed plan to tackle Scope 1, 2 and 3 emissions. It will take time. But like any journey, it begins with the first step.

57.    On April 28, 2021, the Company issued a press release announcing its Q1 2021 results.  In addition to promoting the Company's purported commitment to sustainability, the press release stated: "[s]imilar to previous years, the Partnership expects net income, adjusted EBITDA, and distributable cash flow for the second half of 2021 to be significantly higher than for the first half of the year, and for the fourth quarter to be a significant step up from the third quarter."

58.    On April 29, 2021, the Company hosted an earnings call with investors and analysts to discuss the Company's Q1 2021 results (the "Q1 2021 Earnings Call").  During the Q1 2021 Earnings Call, Defendant Keppler stated:

> With the tremendous growth we have achieved, coupled with what we had, we will continue to ensure that our wood pellets remain sustainably produced from forces inventories have and continue to grow overtime.
>
> Enviva's practices and internal standards are designed to meet or exceed the established international safeguards and regulations promulgated under [Reg G] (Ph) and reinforced by the recent report issued in January by the EU joint research center, which emphasizes, among other things, the maintenance of long-term production capacity of the forest.
>
> Our track and trace system and our leading responsible sourcing policy provide us with the tools we need to set public transparent goals regarding how we manage, measure and improve our activities.
>
> We also subject ourselves to stringent third-party annual audits to ensure that our operations continue to be certified under independent, globally recognized sustainability standards like FSC, PEFC, SFI and SDP.

59.    On July 28, 2021, the Company issued a press release announcing its Q2 2021 financial results.   In addition to promoting the Company's purported commitment to sustainability, the press release stated:

> "During the second quarter of 2021, Enviva delivered results in line with our expectations for the quarter and laid the foundation for a very strong back half of the year," said John Keppler, Chairman and Chief Executive Officer. "With the benefit of the commissioning and ramp of our Northampton, Southampton,

16

and Greenwood plant expansions, continued progress on our Multi-Plant Expansions, and the substantial contracted cash flow acquired with the drop-downs of the Lucedale plant and Pascagoula terminal, we were pleased to increase our guidance for 2021, announce guidance for 2022, and complete a sizeable equity raise. We believe Enviva is firmly on track to deliver a strong full-year 2021 and an even more robust 2022."

60.    On July 29, 2021, the Company hosted an earnings call with investors and

analysts to discuss the Company's Q2 2021 results (the "Q2 2021 Earnings Call").  During the

Q2 2021 Earnings Call, Defendant Keppler stated:

Based on our solid first half financial performance, coupled with the contracted cash flow acquired as part of the acquisitions, and the growth profile we expect for the second half of the year. The Board declared a distribution of and $0.815 per unit for the second quarter of 2021, a 6.5% increase over the distribution paid for the same quarter of last year. This represents our 24th consecutive distribution increase and maintains the 12% distribution CAGR we have delivered since our IPO.

***

With the tremendous growth we have achieved, combined with what we see ahead, tools like our proprietary track and trace system and our industry leading responsible sourcing policy will continue to ensure that our wood pellets remain sustainably produced from forests whose inventories have continued to grow over time.

As you may recall, we also subject our operations to stringent third-party annual audits. And we are pleased to report we continue to be certified under leading independent globally recognized as sustainability standards like FSC, PEFC, SFI and SDP.

We expect the progress that we were making on our own net zero commitments to further reinforce our environmental leadership and reputation for sustainability. We are progressing efforts to immediately mitigate or offset all of our Scope 1 emissions and we have several exciting process changes and input substitutions underway in our manufacturing facilities.

***

Sustainability is at the core of our value proposition, and our net zero advancements only make the product we manufacture that much more valuable in our effort to displace coal, grow more trees, and fight climate change.

61.     On November 3, 2021, the Company issued a press release announcing its Q3

2021 results.  In addition to promoting the Company's purported commitment to sustainability,

the press release stated:

> "The future has never been brighter for Enviva. With our transformative
> Simplification Transaction and Conversion, along with our expanding
> production capacity underpinned by our existing assets, the plant expansions
> underway, and the commissioning of the Lucedale plant and the Pascagoula
> terminal, we are entering 2022 with increased size and scale, a significantly
> improved cost of capital, and a broadening customer base. With the potential of
> exponential growth ahead for our product, driven by global commitments to 'net
> zero,' we are continuing to build a company and a platform that delivers real
> climate change benefits, today, while consistently and sustainably delivering
> superior returns to our stakeholders."

62.     On November 4, 2021, the Company hosted an earnings call with investors and

analysts to discuss the Company's Q3 2021 results (the "Q3 2021 Earnings Call").  During the

Q3 2021 Earnings Call, Defendant Keppler stated:

> Based on the durability of our business model and the strong cash flow visibility
> we have going forward, our Board of Directors declared a distribution of $0.84
> per unit for the third quarter of 2021, an 8.4% increase over the distribution paid
> for the same quarter of last year. This represents our 25th consecutive
> distribution increase since our IPO and maintains the 12% distribution category
> we have delivered since then. We are also reaffirming the full year 2021 and
> 2022 guidance we discussed recently, which we updated alongside our
> simplification transaction and conversion announcement.
>
>                                    ***
>
> "Our renewable products help our customers meet their net zero targets and we
> expect our own net zero commitments to further reinforce our environmental
> leadership and reputation for sustainability. We are in a very fortunate position
> to have built a business that by design generates only a modest level of
> emissions from our own operations."

63.     On February 28, 2022, the Company issued a press release announcing the

Company's Q4 and full year 2021 results.  In addition to promoting the Company's purported

commitment to sustainability, the press release stated:

> "We are very pleased with our recent equity offering, which enabled us to both
> broaden our investor base and increase Enviva's trading liquidity," said Shai
> Even, Executive Vice President and Chief Financial Officer. "We are seeing
> meaningful interest from global ESG-focused investors, and are looking

forward to being included in numerous indices in the coming quarters. Additionally, the equity offering was an important initial step as we look to transition to a self-funding model for growth. Our capital allocation policy is focused on reinvesting retained cash flows into our business, while maintaining conservative leverage, and preserving a stable dividend that has the opportunity to grow over time."

64.    On March 1, 2022, the Company hosted an earnings call with investors and analysts to discuss the Company's Q4 2021 results (the "Q4 2021 Earnings Call"). During the Q4 2021 Earnings Call, Defendant Keppler stated: "[w]e are incredibly privileged to have the opportunity to continue to build a company and a unique platform that delivers real climate change benefits today at scale, while consistently, safely and sustainably generating superior returns for all of our stakeholders."

65.    On March 4, 2022, the Company filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K contained substantively similar discussions of the Company's business, wood fiber procurement, sustainability, and Health, Safety, Sustainability and Environmental Committee as discussed above.

66.    On May 4, 2022, the Company issued a press release announcing the Company's Q1 2022 results. The press release stated:

**Sustainability Update**

The challenges of the current geopolitical environment remind us that the work ahead to mitigate the effects of climate change now will be hard and likely contentious.

As a pioneer in the biomass industry, we've built a business focused on our core values: caring about people and our communities, fighting climate change by displacing coal, and ensuring that we are growing more trees, managing our business under industry leading sustainability practices that ensure that we are delivering favorable impact to energy and the environment in line with the IPCC guidance.

67.    On May 5, 2022, the Company hosted an earnings call with investors and analysts to discuss the Company's Q1 2022 results (the "Q1 2022 Earnings Call").  During the Q1 2022 Earnings Call, Defendant Keppler stated:

> We continue to be very proud of our rare combination of being a high growth company and a strong dividend pair. We're the largest global player in an industry where the total addressable market is rapidly expanding and new use cases for our product continue to emerge. We are virtually unmatched in terms of the fully contracted date of our business and the highly visible and durable cash flow growth that our business generates, as well as the truly remarkable growth prospects ahead of us.
>
> ***
>
> As a pioneer in the biomass industry, we've built a business focus on our core values, caring about people in our communities, fighting climate change by displacing coal and ensuring that we are growing more trees, managing our business under industry-leading sustainability practices that ensure that we are delivering favorable impact to energy and the environment right in line with the IPCC guidance. We source our renewable wood fiber from the U.S. Southeast, a region where forests are primarily owned by private land owners. And these sustainability managed forests have grown by over 40% over the last 25 years.

68.    On August 3, 2022, the Company issued a press release announcing the Company's Q2 2022 financial results.  In addition to promoting the Company's purported commitment to sustainability, the press release stated:

> [. . .] "The sheer volume and size of market opportunities with high-quality counterparties across a range of use cases, from renewable energy generation to displacement of fossil fuel-based carbon in hard-to-abate industries, is creating an unprecedented pace of contracting for us, which in turn is underwriting the acceleration of our capacity expansions. We have recently commenced construction of our plant in Epes, Alabama, we are making swift progress on our plans to start construction of a new plant in Bond, Mississippi, and we have recently filed for a permit for a highly accretive expansion of our Ahoskie, North Carolina plant. The growth in our production volume outlook, coupled with the strong pricing environment for biomass, is driving our expectations for an adjusted EBITDA compound annual growth rate of over 25% from 2022 to 2024. This tremendous, fully contracted growth profile, combined with the strong, stable dividend we are paying, makes us well positioned to continue our track record of generating significant returns for our investors, even in an environment of potential economic contraction."

69.    The statements referenced above were materially false and misleading because Defendants failed to disclose that: (i) the Company had misrepresented the environmental

sustainability of its wood pellet production and procurement; (ii) the Company had similarly overstated the true measure of cash flow generated by the Company's platform; and (iii) accordingly, the Company had misrepresented its business model and its ability to achieve the level of growth that Defendants had represented to investors.

*2022–2023 False and Misleading Statements*

70.    Following this, throughout 2022 and 2023, the Individual Defendants caused the Company to make materially false and misleading statements and failed to disclose material information about the financial condition of the Company, including its EBITDA and net loss forecasts, liquidity position, capital allocations, operation costs, productivity, and the impact of these metrics on the Company's ability to continue paying dividends in 2023.

71.    After the market closed on November 2, 2022, the Company issued a press release and filed its Form 8-K with the SEC reporting its third quarter 2022 results and issued its full year 2023 guidance ("November 2, 2022 Press Release").

72.    In the November 2, 2022 Press Release, the Company issued 2023 adjusted EBITDA guidance of $305 million to $335 million which Defendant Evan stated "would cover [their] current, stable dividend of $3.62 per share at 1.1 times, at the midpoint of this range." Defendant Meth falsely stated on the call that the Company was experiencing "[p]roductivity improvement" and "capacity expansions" that "combined with" Enviva's "improving supply chain conditions and the constructive pricing environment," were expected "to drive incremental margin and cash flow":

> Productivity improvements across our manufacturing facilities . . . and the capacity expansions we have underway, are resulting in production rates that we expect to translate to over 6 million tons next year, and when combined with our improving supply chain conditions and the constructive pricing environment, particularly in Europe, are expected to not only provide modest opportunities in fourth-quarter 2022 to drive incremental margin and cash flow, but also set the stage for substantial growth in 2023 and beyond. We are projecting meaningful year-over-year step-changes in the cash flow generation of our asset base, as we bring new fully contracted capacity online in a favorable pricing environment for our products. Going forward, our capital allocation

policy is focused on reinvesting retained cash flows into our business, while maintaining ample liquidity, conservative leverage, and preserving a stable dividend that has the opportunity to grow over time.

73.    Defendants attributed the shift of roughly $3 million of adjusted EBITDA for the third quarter solely to delays related to Hurricane Ian and at no point acknowledged to investors that there were larger issues at play.

74.    According to the 2022 Form 10-K, the Company expected to derive substantially all of its 2023 revenues from six customers, four located in Europe, and two located in Japan. The majority of these commitments are off-take contracts which are long-term in nature.  Off-take contracts are considered "take-or-pay" because they include a firm obligation of the customer to take a fixed quantity of product at a stated price and include provisions requiring that the seller be compensated in the case of a customer's failure to accept all or a part of the contracted volumes.  These long-term off-take contracts were generally fixed for the entire term.

75.    According to the November 2, 2022 press release issued by the Company, "[a]s of October 1, 2022, the Company's total weighted-average remaining term of take-or-pay off-take contracts [was] over 14 years, with a total contracted revenue backlog of over $21 billion. This contracted revenue backlog [was] complemented by a customer sales pipeline exceeding $50 billion, which includes contracts in various stages of negotiation."

76.    During a November 3, 2022 earnings call, Defendant Keppler stated that "[a]s we look into 2023, we are really starting to hit our stride as a corporation … We are currently forecasting adjusted EBITDA for 2023 to be in the range of $305 million to $335 million dollars, which would cover our stable current dividend of $3.62 per share at 1.1 times, at the midpoint of this range."

77.    When questioned by an analyst about the year-to-date negative cash flow from operations, Defendant Even responded that "the dividend should give you a sense about how

strong you should expect to see the cash flow from operating activities … So bottom line, very strong cash flow from operating activities in 2023." Even attributed the year-to-date negative cash flow to costs relating to the Company's transition from a partnership to a C corporation and elaborated that these corresponding costs "are winding down to a *de minimus* number in Q4 of 2022."

78.     Defendant Keppler also informed shareholders that "the benefit of the multi-plant expansions drives increased volume and improves fixed cost absorption ... when combined with the benefit of the constructive pricing environment and inflationary escalators within our existing and new long term contracts, we continue to be well positioned for robust cash flow growth even in an environment with potential recessionary pressures."

79.     However, as revealed in the Company's 2023 Q1 earnings announcement (discussed *infra*), these statements were false and misleading and failed to disclose material information about the financial condition of the Company including its EBITDA and net loss forecasts, liquidity position, capital allocations, operation costs, productivity and the impact of these metrics on the Company's ability to continue paying dividends in 2023.

80.     False and misleading statements that failed to disclose material information about the financial condition of the Company were reiterated by the Company in a subsequent press release issued on March 1, 2023 ("March 2023 Press Release"), in its investor presentations dated March 14, 2023 and April 3, 2023 and in its fourth quarter 2022 earnings call held on March 1, 2023 ("Q4 2022 Earnings Call").

81.     In a March 1, 2023 Press Release, the Company reported its fourth quarter results, before the market opened, and reaffirmed its 2023 guidance:

**2023 Guidance**

| $ millions, unless noted | 2023 Guidance |
|---|---|
| Net loss | (48.0) - (18.0) |
| Adjusted EBITDA | 305 - 335 |
| Dividend per Common Share ($/Share) | 3.62 |
| Total Capital Expenditures | 365 - 415 |

For a reconciliation of forward-looking non-GAAP measures to their most directly comparable GAAP measure, please see the Non-GAAP Financial Measures section below.

Net loss guidance for 2023 is projected to be a range of $48 million to $18 million. Adjusted EBITDA for 2023 is projected to be within a range of $305 million to $335 million, which reaffirms previously provided preliminary outlook estimates …

Dividend per common share for 2023 is forecasted to be the same as 2022, with $0.905 per share expected to be declared quarterly, for an aggregate annual dividend payout of $3.62 per share.

Enviva forecasts that total capital expenditures (inclusive of capitalized interest) will range from $365 million to $415 million for 2023, with investments in the following projects:

> • Greenfield site development and construction projects, ranging from $295 million to $325 million
>
> • Accretive capital-light projects, ranging from $50 million to $70 million
>
> • Maintenance capital for existing asset footprint expected to be approximately $20 million

Total capital expenditures are scheduled to be back-end weighted for 2023.

82.    The Company also represented that it had "[e]ntered 2023 with substantial liquidity, with available funds to support capital expenditures and operations of approximately $384 million."

83.    On March 1, 2023, the Company held its earnings call to discuss its financial and operating results for the fourth quarter and full year 2022 and to reaffirm 2023 guidance. On this call, Defendant Meth stated "I have strong conviction around our ability to not only

24

deliver $305 million to $335 million in adjusted EBITDA for 2023 but also to double adjusted EBITDA over the next four years and to self-fund our growth by 2027."

84.     Further, Defendant Meth represented that "… for 2023 when you look at our cash flow from operations. What we expect is that our normal course of business fulfilling our contracted backlog in 2023 will generate operating cash flow that will not only cover our dividend that we've guided to but in fact exceed that dividend.  So that's I think it's important to note, what you should expect from us and what we have conviction around for 2023."  The Company reported approximately $23.5 billion of product sales backlog for contracted product sales to long-term off-take customers as of January 1, 2023.

85.     With regard to Company operations, Defendant Meth informed shareholders that:

> "[W]hile [the Company] delivered record-breaking volumes from our large and growing production fleet our cost position was higher than we had anticipated. Inflationary adjustments and pass-throughs in our contracts covered us well but dramatically improved supply chain conditions combined with lower energy costs and lower delivered fiber costs in our operations coupled with higher fixed cost absorption rate in 2023 will deliver a significant uplift to expected cash flow setting us up for a strong year in 2023 and beyond."
>
> ***
>
> "[P]rogress in driving increased output from our plants with several capacity improvements now in place including some debottlenecking and process throughput upgrades we have completed. Another important improvement is the work we've done around our high grading of our workforce and with improved supply chain conditions as we enter 2023, we expect to deliver a meaningful lower cost position in our cost per pellet ton over time."

86.     Further, on cost, liquidity, and leverage, Defendants Meth and Even made the following representations:

**Thomas Meth**

> "I think the biggest difference you will see comes from improved fixed cost absorption. Why do we have such conviction around that fixed cost absorption, is because our plants have proven that they can do it in the later part of 2022. As you've heard us say in the past we've -- we commissioned our Lucedale plants in 2022 and it is fully ramped. In addition to that we had very accretive

25

upsizing opportunities over the last year or two in some of our existing plants, they have been completed and those plants have shown that they have broken through previous bottlenecks to now deliver volumes at an elevated rate. That fixed cost absorption will be a major driver for our conviction in our increased guidance range for 2023."

**Shai Even**

 "For 2023, we are focusing as reported leverage and we've (inaudible) leverage to be similar to 2022 at around 4.8 times and 3.7 times respectively."

"…as Thomas mentioned we are driving cost out of our business and benefiting from higher fixed cost absorption across our fleet because of higher production rates and production efficiencies."

87.    Certain of the Individual Defendants once again reiterated the misleading statements in an investor presentation dated March 14, 2023 ("March 14, 2023 Investor Presentation").

| $ millions, unless noted | 2023 Guidance |
|---|---|
| Net Loss | (48.0) – (18.0) |
| Adjusted EBITDA | 305.0 – 335.0 |
| Dividend per Common Share | $3.62 |

88.    The March 14, 2023 Investor Presentation also promoted the following:

- "~6.2 Million MTPY of Nameplate Production Capacity"

- "Attractive Dividend Yield – 2023 Dividend Guidance of $3.62 per share of common stock;"

- "~$24 Billion Take-Or-Pay Contracted Backlog" and

- "Conservative Financial Policies Green Finance Framework – Prioritizing conservative leverage (target ratio of 3.5x-4.0x) . . ."

89.    Further, after providing the FY 2022 financial results, the presentation falsely assured shareholders of "Stable, Durable Dividends" and "Strong Dividend Coverage" in 2023 based on a forecast of "Strong Cash Flow From Operating Activities ('CFFO')," which could "cover dividends @ 1.09x to 1.30x."

4858-9120-2452, v. 6

**Stable, Durable Dividends:**

- During 2022, quarterly dividend payout was flattened to a stable $0.905/share, for to a total dividend payout of $3.62/share for 2022
- Dividends are projected to remain stable during 2023, at a quarterly payout of $0.905/share, with an expected total dividend payout of $3.62/share

**STRONG DIVIDEND COVERAGE**

- Dividend coverage of over 1.0x projected for 2023; long-term target of 1.5x dividend coverage projected by 2026[1]

90.     Defendants also represented that it had "substantial liquidity" going into FY 2023 and expected to end 2023 with a liquidity of ~$390 million, after taking into account dividend payments of ~$230 million and assuming no further equity or debt issuances were made during 2023.  Certain of the Individual Defendants also projected that, even after paying out the stated dividends, the Company would maintain a "conservative leverage" of ~3.7x.

**SUBSTANTIAL LIQUIDITY & ATTRACTIVE DIVIDEND YIELD**

- Pro forma liquidity, including PIPE and Term Loan, is approximately $733 million as of December 31, 2022
- Stable, growing cash flows are expected to enhance financial flexibility and provide the ability to increase dividends and return of capital to shareholders over time, as new plants are placed in service the

**CONSERVATIVE LEVERAGE**

- Leverage ratio target is between 3.5 and 4.0 times, as calculated under the terms of our revolving credit facility:
  → Our 2022 year-end leverage on a pro forma basis for the PIPE transaction, excluding the DGMT impact, was ~4.7x on a reported basis, and ~3.5x based on our credit facility agreement
  → For 2023, reported leverage is forecasted to be ~4.8x, with leverage as calculated by our credit facility agreement being ~3.7x

91.     Based on this, the Company reaffirmed its 2023 guidance. However, as discussed *infra*, the Company's May 1, 2023 earnings announcement, where the Company decided to suspend dividend payments in order to save cash to maintain a leverage of 4.3x, revealed that the above statements were untrue.

92.     The March 2023 Investor Presentation further represented that its 2023 guidance was driven by the following factors:

• "Sales price increases"

• "Increased produced volume"

27

• "Lower commodity prices"

• "Operating cost reductions expected"

93.    Further, on April 3, 2023, the Company held an Investor Day at the New York Stock Exchange, discussing the Company's strategy, long term outlook and financial expectations for 2023.  As part of this event, the Company released a presentation, which was filed on a Form 8-K with the SEC on the same day (the "April 3, 2023 Investor Day Presentation").

94.    The April 3, 2023 Investor Day Presentation touted "stable and secure dividend," "increasing cash flow stability" (with a forecasted liquidity of ~$400 million at the end of 2023, up ~$10 million since the March 2023 presentation) and "conservative leverage." The Company also reaffirmed projected EBITDA between $305-355 million, production volumes of 5.5 – 6 million MTPY in 2023 and a 11% decrease in 2023 costs on account of various factors including increasing production volumes, strategic procurement of raw materials, and decreasing commodity prices.

95.    With respect to the Company's liquidity position, Defendant Meth touted that the Company had "plenty of liquidity, complemented by growing long-term cash flows" which "protect[ed] [the Company's] stable dividend" and also stating:

> We have very strong liquidity positions. The *pro forma* for year-end 2022, our liquidity $733 million, that includes the benefit of the pipe and the term loan completed both in Q1 2023. Our liquidity expected to be at year-end 2023 $400 million. And let me unpack this for you. Starting with $733 million liquidity, pro forma for year-end 2022, we are adding to that cash flow from operating activities for 2023, which we're expecting that to be $300 million and we expect the mid-range to use in capital expenditures $390 million during 2023. And after accounting for dividends of $230 million, we are expecting strong liquidity position with $400 million at year-end 2023 without issuing debt, without issuing equity.

96.    However, merely a month later, this statement turned out to be false when the Company decided to suspend dividend payments on grounds of "effectively managing liquidity" as discussed *infra*.

**THE TRUTH EMERGES**

97.     With respect to the false and misleading statements made between 2019 and 2021, the truth emerged in October 2022.  At the same time, as outlined *supra*, separate false and misleading statements were made between 2022 and 2023, for which the truth emerged in May 2023, as detailed below.

**2019–2021 Statements**

98.     On October 12, 2022, during pre-market hours, *Blue Orca* published a report on the Company.  Among other allegations, the *Blue Orca* report stated:

> Enviva claims to be a pure play ESG Company with a healthy, self-funded dividend and cash flows to provide a platform for future growth.  We think this is nonsense on all counts.
>
> In our opinion, Enviva is a dangerously levered serial capital raiser whose deteriorating cash conversion and unprofitability will drain it of cash next year. Contrary to Enviva's claims, it generates nowhere near the cash from operations to support its dividend, let alone future capital expenditures to drive growth. Rather, Enviva's dividends are funded through capital raising. Given its already troubling leverage, we think Enviva will be forced into further dilutive equity raises, more borrowing at punitive rates, or most likely, a significant dividend cut.
> We believe that Enviva is the latest ESG farce, a product of deranged European climate subsidies which incentivize the destruction of American forests so that European power companies can check a bureaucratic box. In an Orwellian twist, even though burning wood emits more $CO_2$ per unit of heat generated than any major energy source (including coal), an arcane carbon accounting loophole subsidizes European power companies to replace coal with wood pellets derived from deforestation in the United States. All in the name of climate activism.
>
> In our opinion, Enviva is engaging in textbook greenwashing. Hidden GPS data embedded in Enviva's Track and Trace disclosures allowed us to geolocate the Company's harvests. Satellite imagery indicates that contrary to the Company's claims, in many instances Enviva is procuring wood from the widely condemned practice of clear-cutting. Former senior Enviva sustainability and procurement executives confirmed that this practice was endemic. We also think this explains the "exodus of sustainability leadership" from Enviva in 2021, including the recent resignations of both authors of the Company's prominent sustainability "white paper."
>
> Ultimately, we think that any legitimate ESG investor or allocator should be embarrassed to own this stock. But in addition to evidence of greenwashing, Enviva's troubling cash flows, dangerous leverage, and unsustainable dividend

only add further momentum to the short thesis, which is why we expect the stock price to contract significantly from Enviva's current nosebleed valuation.

1. **Hidden Metadata Reveals that Enviva Procures Wood from Clear-Cutting Forests**. Enviva publicly denies clear-cutting forests, the controversial practice of removing full swaths of forest which is widely condemned by ESG investors and climate change advocates. Although Enviva refuses to disclose to watchdogs or investors the exact location of its harvests, when we analyzed the metadata from its Track and Trace database, we found embedded GPS coordinates. We think that there is a reason Enviva tried to conceal this data. When we geolocate Enviva's harvests using these GPS coordinates, satellite imagery reveals hundreds of images of clear-cut forests, suggesting that the practice is widespread and that Enviva is misleading investors. We corroborated this with interviews of two former senior Enviva executives, who unequivocally stated that Enviva sources wood from clear-cutting. A former senior Enviva sustainability executive lamented that the practice was routine because clear-cutting was cheaper than other more sustainable methods of harvesting. Ultimately, multiple strands of independent evidence, from the statements of former senior executives to satellite imagery, indicate that Enviva is procuring wood from clear-cutting, a practice roundly rejected by ESG investors and expressly discouraged by EU sustainability guidelines.

2. **Enviva Drives Demand for Deforestation**. Enviva claims that harvesting forests for wood pellets is sustainable and produces lower greenhouse gas emissions than coal because it is only harvesting waste left by the timber industry, scraps that otherwise would be left to rot on the forest floor. Enviva insists that it does not drive demand for deforestation or influence the harvesting decisions of landowners because the Company claims to purchase on average less than 30% of the wood from each harvest. The other 70%, according to Enviva, is higher value timber sold to other industries. Yet Enviva's own Track and Trace data shows that the Company is violating this key threshold and is likely driving demand for deforestation.

   (a) **Enviva Track and Trace Data Contradicts Reported Harvesting Threshold**. On its website, Enviva publishes its Track and Trace data, including the total acreage harvested and the proportion of each harvest purchased by Enviva. This data shows that Enviva took greater than 30% of the volume of the harvest in over 2/3rds of the acreage harvested by the Company, including a substantial amount of acreage in which Enviva took 70-100% of the wood harvested. According to a former high-level sustainability officer we interviewed, Enviva takes 70-90% of the volume in "plenty of tracks" because of the low prices for such wood. The larger the proportion of a harvest taken by Enviva, the more likely Enviva's presence and payments are driving the economics that influence a decision of the landowner to cut the forest down. In our opinion, Enviva's own data provides compelling evidence that the Company is driving demand for deforestation and misleading investors regarding its procurement practices.

3. **Hardwood Forest Inventory is Decreasing Around Enviva's Facilities**. As evidence of the purported sustainability of its practices, Enviva claims that forest inventories are increasing in sourcing regions around its facilities. This is misleading, because it ignores that inventories of hardwood trees are decreasing, replaced by less expensive pine seedlings and negatively impacting forest biodiversity. Recent academic and scientific studies analyzing satellite imagery around Enviva's facilities concluded that it was "very likely" that Enviva's pellet mill operations contributed to elevated rates of deforestation of deciduous trees in the area. This ties directly to Enviva's valuation in that it directly undermines the Company's claims regarding the sustainability of its practices and its already controversial standing as an environmentally friendly stock suitable for ESG investors.

4. **"Exodus of Sustainability Leadership" in 2021**. Turnover at the CFO or chief accounting officer position can often be a sign of accounting shenanigans or even fraud, and smart investors tend to haircut a valuation when confronted with a cluster of high-profile resignations. In this case, three of Enviva's key sustainability officers resigned within months of each other in 2021. These were high profile departures, including the Chief Sustainability Officer and the coauthor of the Company's sustainability white paper. Both were the public face of Enviva's attempt to attract ESG investment, making their departure akin to a CFO and chief accounting officer resigning at the same time. A former senior sustainability executive we interviewed stated that Enviva's C-level "were making too many decisions that ran contrary to the values that the Company was purporting to have." In our opinion, this lends further credence to our investment opinion that Enviva is greenwashing its ESG credentials.

5. **Evidence that Enviva Inflates Profit Margins by Providing Equipment to Loggers in Exchange for Reduced Prices**. Based on conversations with a former procurement officer, we believe Enviva may be burying some of its costs in capital expenditures, thereby inflating its EBITDA and adjusted gross profit. Specifically, the former employee told us that Enviva provides capital equipment such as woodchippers to loggers in exchange for reduced wood prices. Enviva's former VP of procurement implied that this practice was common, as it would not be feasible for loggers to cut many forests without this "subsidy" from Enviva. Enviva is not profitable under GAAP accounting and has reported $1 billion in capital expenditures since 2015. In our view, not only does this arrangement undermine Enviva's reported non-GAAP profitability metrics, but subsidies to logging companies further destroys the notion that Enviva plays a benign role in deforestation.

6. **Looming Dividend Cut**. Enviva trades at an eye-watering 10x tangible net asset value and 36x LTM Adjusted EBITDA because shareholders mistakenly believe that its business will continue to support its large historic dividends. However, we calculate that Enviva's business generates nowhere near the cash required to fund its dividend and that following the 2021 restructuring transaction, Enviva's distributable and operating cash flows are now negative. This is likely why the Company has been a serial capital raiser, raising $2.3 billion through debt and dilutive equity issuances since

2015. Based on Enviva's reported cash balance and guided capital expenditures, we calculate that Enviva's cash burn is so severe that it will run out of cash in 1H 2023. Enviva is now excessively levered (5.2x Net Debt to EBITDA) and LTM 1H 2022 operating cash flows were negative $91 million, meaning its only choice will be to either continue diluting shareholders with equity issuances or, more likely, cutting its dividend.

7. **Enviva Historically Overpaid for Related Party Acquisitions?** 57% of Enviva's EBITDA growth since IPO has come from acquiring pellet facilities from its largest shareholder. The Company claims that these acquisitions were made at an attractive multiple of 6-7x EV/EBITDA. Yet since these acquisitions, Enviva's cash conversion has begun to diverge materially from adjusted EBITDA. Based on the poor cash conversion, we suspect that these facilities generate half the EBITDA claimed, which would imply an acquisition multiple nearer 12x. We also calculate that Enviva paid an average price of $310 per tonne of capacity for its four most recent acquisitions from its largest shareholder, 42% more per tonne than it paid to acquire Waycross from an independent third party in 2020. Ultimately, such calculations raise not only governance concerns, but also undermine the Company's reported EBITDA and guidance.

Ultimately, we view Enviva as an ESG farce, and evidence of greenwashing in the Company's procurement processes undermines not only Enviva's suitability as an ESG investment, but future demand for its product. We do not believe that investors should reliably model the continuation of environmental subsidies for European customers to buy wood pellets procured from clear-cutting American forests in the name of climate activism. In addition to evidence of greenwashing, it's also a bad business. Enviva's troubling cash flows, dangerous leverage, and unsustainable dividend only add further momentum to the short thesis, which is why we expect the stock price to contract significantly from Enviva's current nosebleed valuation.

99.    On this news, the Company's stock price fell $7.74 per share, or 13.13%, to close at $51.23 per share on October 12, 2022.

**2022–2023 Statements**

100.    On May 3, 2023, only a month after the April 3, 2023 Investor Day Presentation, the Company announced its first quarter 2023 financial results and unexpectedly revised down its 2023 guidance while entirely eliminating the quarterly dividend.  It lowered its 2023 adjusted EBITDA projections from a range of $305-335 million to $200-250 million, lowered its Net loss projection from $18-48 million to $136-186 million, and suspended dividend payments for 2023.

101. In a press release on the same day, Defendant Keppler announced that "the originally forecasted operational and financial performance [of the Company] … [was] clearly taking longer than expected" and a decision "to revise Enviva's capital allocation framework, eliminating the Company's quarterly dividend" was implemented "in order to preserve liquidity and a conservative leverage profile, maintain [ ] current growth trajectory, potentially accelerate future investments in new fully contracted plant and port assets, and implement a limited share repurchase program."

102. Defendant Keppler attributed the change in cost position, "in part due to slower volume growth, and in part due to a higher spend profile for the volume growth we did achieve." Defendant Meth provided:

> "We know what the specific issues are: contract labor is too high, discipline around repairs and maintenance spend is insufficient, wood input costs need to come down further and stay there, and utilization rates at specific plants need to improve and stabilize at those improved levels. Because of where we are in our journey to bend our cost curve down while bending our production curve up, we feel it is prudent to take a much more conservative view of what our business can realistically achieve over the next eight months."

> \*\*\*

> "Operating cost overages and production challenges were key drivers behind the first quarter's poor performance. While plant production is increasing and we are reducing our operating cost position, neither improvement is materializing at the rate we forecasted a few months ago. Based on results from the first four months of the year, we believe it is prudent to take a more conservative view on the timing of our ability to deliver these improvements."

103. On May 4, 2023, the Company held an earnings call on which Defendant Meth blamed these revisions on: (i) customer mix impacting results; (ii) unplanned repairs and maintenance expenses; (iii) professional fees; and (iv) shipments subject to deferred gross margin accounting. Defendants had previously failed to inform investors of the potential impact of customer mix, which as of the May 4, 2023 earnings call was said to account for $16 million of the difference between actual results and expectations. Instead, Defendant Meth had misrepresented on the March 1, 2023 earnings call that there was "incredible momentum with

our customers with a new set of customers in just the last few weeks, all at higher pricing than we have seen historically."

104.    Defendants attributed $10 million of the difference between actual results and expectations to unforeseen repairs due in large part to "operations leadership [who] had prioritized production over cost management."   Defendant Meth had previously assured investors "[w]e are laser focused on improving operational performance and cost management across our asset fleet, and I'm happy to report we're making noticeable strides forward."

105.    Defendant Meth attributed $5 million of the difference between actual results and expectations to "professional fees" associated in part with plant optimization initiatives such as the hiring of a third-party operational improvement consultant to assist with issues at the Southampton plant.  Defendant Meth stated that:

> "Two of our plants, Greenwood and Southampton, are what we call dryer limited, meaning that we're either bottlenecked at the dryer because of its inherent evaporative limitations to reduce the moisture content in the raw material, which is the case at Greenwood, or on a reliability or operability basis, which is the case at Southampton, where the original dryer line needs refurbishment.... And where we have struggled a little bit is, certainly on the reliability of those new plants.  We have certainly struggled a little bit with third-party cost management, and we've struggled with turnover, right?"

106.    However, Defendants had previously failed to disclose ongoing issues at any of their plants, and instead Defendant Meth had reported "progress in driving increased output from our plants with several capacity improvements now in place including some debottlenecking and process throughput upgrades we have completed."

107.    In response to this news, the Company's stock price collapsed 67.2%, from $21.35 per share on May 3, 2023 to $7.01 per share on May 4, 2023.

108.    On May 9, 2023, the Company released an investor presentation entitled "1Q 2023 Update" dated May 9, 2023, which was posted on the Company's website www.envivabiomass.com and also filed with the SEC on a Form 8-K, which provided more insight into the reasons for the revision of guidance and the elimination of dividends –

revealing, for the first time, the true state of the Company's financial condition (the "May 2023 Investor Presentation").

109.    In the May 2023 Investor Presentation, the Company indicated that its 2023 guidance was being revised for the following reasons:

- Entered 2023 at a much higher cost position than anticipated

- Exiting 1Q at $155/MT Delivered at Port costs vs. original expectations of $145/MT (NCV adjusted)

- More conservative view on what the business will deliver, given 1Q performance and shift in timing expectations as to when productivity and cost improvements are expected to be fully realized.

110.    The May 2023 Investor Presentation further indicated that the suspension of dividend payments, which was saving the Company $1 billion in cash flow from 2023 – 2026, was being implemented to prioritize the following:

1.    Effectively managing liquidity and leverage

2.    Improving operating cost and productivity of current asset platform, and investing in new fully contracted wood pellet production plants

3.    Returning capital to stockholders through share repurchases, and

4.    Accelerating, when appropriate, investments in new fully contracted wood pellet production assets"

111.    Notably, the May 2023 Investor Presentation also revealed that in a span of just one month, the Company had revised its 2023 expected production volumes from 5.5 – 6.0 million MTPY to 5.0 - 5.5 million MTPY, purportedly owing to the slower than anticipated rate of productivity increases and operational issues in the manufacturing plants.

112.    The presentation also revealed that the Company expected to exit 2023 with a leverage ratio of 4.3x after eliminating dividend payments entirely, which was surprising because of its marked departure from the earlier stated expectation of a 3.5x-4.0x leverage after accounting for dividend payments -- and this departure only in the short span of one-month.

113.    As a result of Defendants' wrongful acts and omissions throughout the Relevant Period, and the precipitous decline in the market value of the Company's common shares, the Company has suffered significant losses and damages.

## DAMAGE TO THE COMPANY

**Securities Class Action**

114.    On November 3, 2022, a securities class action complaint was filed in the United States District Court for the District of Maryland against the Company and Defendants Keppler and Even for the false and misleading statements made between 2019–2021.  The complaint alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, in the case captioned: *Fagen v. Enviva Inc., et al.*, Case 8:22-cv-02844-DKC (D. Md.) ("Fagen Action").

115.    Then, on September 12, 2023, another securities class action complaint was filed in the United States District Court for the District of Maryland against the Company and Defendants Keppler, Meth, Even, and Johnson for the false and misleading statements made between 2022–2023.  The complaint alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, in the case captioned: *Dhatt v. Enviva Inc., et al.*, 8:23-cv-02474-DLB (D. Md.) ("Dhatt Action").

116.    As a result of the wrongs complained of herein, Defendants Keppler, Meth, Even, and Johnson have subjected the Company to the significant cost of defending itself.  The Company will continue to incur significant sums in relation to the Fagen Action and the Dhatt Action and any liability or settlement that results.

**Unjust Compensation**

117.    At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants.  The Company paid the Individual Defendants in connection with their

4858-9120-2452, v. 6

respective roles as officers and/or directors of the Company. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

118.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

119.    In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

120.    The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

121.    The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

4858-9120-2452, v. 6

## CORPORATE GOVERNANCE

122.    As members of the Company's Board, the Director Defendants are required to follow the Company's Code of Ethics, its corporate governance guidelines and the charters of each committee of the Board.

123.    Accordingly, the Individual Defendants were held to the highest standards of honesty and integrity and charged with overseeing, among other things, the Company's business practices and policies.  More pertinently, each of the Individual Defendants were required to be familiar with the Company's internal controls, all applicable rules and regulations, and ensure all disclosures regarding the Company were full, fair, and accurate.

124.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DIRECTOR DEFENDANTS

125.    As members of The Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

126.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

127.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the

38

Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in a fair, just, honest, equitable and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

128.   Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

129.   To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

> (a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

> (b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

130.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

131.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

132.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

133.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

134.    Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

135.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

136.    The Company Board is currently comprised of thirteen (13) members – Defendants Alexander, Bumgarner, Wong, Zlotnicka, Davidson, Derryberry, Keppler, Lansing, Lapeyre, Leuschen, Meth, Ubben, and Whitlock.  Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.,* seven (7), cannot exercise independent

objective judgement about whether to bring this action or whether to vigorously prosecute this action.

137.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

138.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

139.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

140.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

**Defendant Meth**

141.    Defendant Meth is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its president and CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Meth cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would

42

expose him to liability and threaten his livelihood.  Accordingly, the Company admits in its 2023 Proxy Statement that Defendant Meth is not independent.

142.    Because of Defendant Meth's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Meth is unable to comply with Defendant Meth's fiduciary duties and prosecute this action.  Defendant Meth is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Dhatt Action.

143.    Moreover, as the Company provides Defendant Meth with his primary source of income, Defendant Meth cannot reasonably consider a demand to sue Defendants Bumgarner, Lapeyre, and Ubben – the Compensation Committee members who control his continued employment and pay – or fellow members of management with whom he works on a day-to-day basis.  Therefore, Defendant Meth is not independent.

**Defendant Keppler**

144.    Defendant Keppler is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its former CEO) was an employee of the Company who derived substantially all of his income from his employment with the Company between 2004 and 2022, making him not independent.  As such, Defendant Keppler cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company. Accordingly, the Company admits in its 2023 Proxy Statement that Defendant Keppler is not independent.

145.    Because of Defendant Keppler's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Keppler is unable to comply with Defendant Keppler's fiduciary duties and prosecute this action.  Defendant Keppler is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Fagen Action and Dhatt Action.

4858-9120-2452, v. 6

146.    Moreover, as the Company provided Defendant Keppler with his primary source of income, and did so for many years, Defendant Keppler cannot reasonably consider a demand to sue Defendants Bumgarner, Lapeyre, and Ubben – the Compensation Committee members who, until recently, controlled his employment and pay – or fellow members of management with whom he worked on a day-to-day basis.  Therefore, Defendant Keppler is not independent.

**Defendants Bumgarner, Whitlock, and Wong**

147.    During the Relevant Period, Defendants Bumgarner, Whitlock and Wong served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia,* overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, the Company's risk management processes and internal controls, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

148.    Defendant Bumgarner, Whitlock and Wong breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Bumgarner, Whitlock and Wong face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Excused**

149.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take

44

action to recover for the Company the damages it has suffered and will continue to suffer thereby.

150.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.  They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

151.    Publicly traded companies, such as Enviva, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages.

152.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Director Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures.  Yet, despite this Code of Conduct, and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the directors.

## CLAIMS FOR RELIEF

### COUNT I

**BREACH OF FIDUCIARY DUTY**
**(Against the Individual Defendants)**

153.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

4858-9120-2452, v. 6

154.    The Individual Defendants each owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants each owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

155.    The Individual Defendants each violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

156.    The Individual Defendants each engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants each breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

157.    As a direct and proximate result of each of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

158.    As a direct and proximate result of each of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT II

### GROSS MISMANAGEMENT
### (Against the Individual Defendants)

159.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

160.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, each abandoned and abdicated their responsibilities and fiduciary

46

duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

161.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

162.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are each liable to the Company.

## COUNT III

### WASTE OF CORPORATE ASSETS
### (Against the Individual Defendants)

163.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

164.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

165.    As a result of the misconduct described above, the Individual Defendants each wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

166.    As a result of the waste of corporate assets, the Director Defendants are each liable to the Company.

47

## COUNT IV

### UNJUST ENRICHMENT
### (Against the Individual Defendants)

167.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

168.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were each unjustly enriched at the expense of, and the detriment of, the Company.

169.    The Individual Defendants each either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

170.    Plaintiff, as a shareholder and representative of the Company seeks restitution from each of the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT V

### Violations of § 10(b) of the Exchange Act,
### 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5
### (Against Individual Defendants Keppler, Meth, Even, and Johnson)

171.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

48

172.    Each of the Individual Defendants Keppler, Meth, Even, and Johnson violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

173.    Defendants Keppler, Meth, Even, and Johnson, individually and in concert, directly or indirectly, each disseminated or approved the materially false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

174.    Defendants Keppler, Meth, Even, and Johnson each violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated.

175.    Defendants Keppler, Meth, Even, and Johnson each acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

176.    Defendants Keppler, Meth, Even, and Johnson, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, each participated in the fraudulent scheme alleged herein.

4858-9120-2452, v. 6

177.    As a result of the foregoing, the market price of the Company's common stock was artificially inflated during the Relevant Period.  In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of the Company's common stock in purchasing the Company common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

178.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm.  Each Defendants Keppler, Meth, Even, and Johnson, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

4858-9120-2452, v. 6

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,


_____*/s/ Cynthia L. Leppert*_____
Cynthia L. Leppert (Bar No. 05857)
**LAW OFFICE OF CYNTHIA
    LEPPERT, LLC**
1 West Pennsylvania Avenue, Suite 980
Towson, Maryland  21204
Telephone: (410) 672-4022
Facsimile: (410) 672-4350
Email: cll@cynthialeppertlaw.com


_____*/s/ Gregory M. Egleston*_____
Gregory M. Egleston (***pro hac vice* motion to be
filed; not admitted in District of Maryland)**
501 Fifth Avenue, 19th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: gegleston@gme-law.com
(Signed on behalf of Gregory M. Egleston by
Cynthia L. Leppert)

*Attorneys for Plaintiff*


Dated: December 5, 2023

## VERIFICATION

I, WILLIAM BROWNING, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Enviva Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Enviva Inc. common stock at all relevant times.

William B. Browning
WILLIAM BROWNING